Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

Craig Solomon Ganz (023650)
Michael S. Myers (029978)
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
ganzc@ballardspahr.com
myersms@ballardspahr.com
Telephone: 602.798.5400
Facsimile: 602.798.5595

Paul S. Hugel (admitted *pro hac vice*)
CLAYMAN & ROSENBERG, LLP
305 Madison Ave - Suite 1301
New York, NY 10165
Telephone: (212) 922-1080
Email: hugel@clayro.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| MELLEN, INC., a New York corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BILTMORE LOAN AND JEWELRY-SCOTTSDALE, L.L.C., an Arizona limited liability company,<br><br>Defendant. | Case No. CV-16-648-PHX-DLR<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Assigned to the Honorable Douglas L. Rayes) |

## INTRODUCTION

Plaintiff Mellen, Inc. ("Plaintiff" or "Mellen") brings this motion for a preliminary injunction to aid it in recovering a $2 million diamond ring stolen from it by a fraudster. The stolen ring is currently held by Defendant Biltmore Loan and Jewelry-Scottsdale, LLC ("Defendant" or "Biltmore"), a pawn broker.

Plaintiff is the owner of a 4.05 carat internally flawless fancy blue heart-shaped diamond (the "Diamond") mounted in a platinum and gold ring. In January 2015, Plaintiff delivered the ring to Scott Meyrowitz ("Meyrowitz"), an individual in Florida who claimed that he was a diamond dealer. Meyrowitz told Plaintiff that he had a

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

potential customer to whom he wished to show the ring. Pursuant to a written agreement, Plaintiff delivered the ring to Meyrowitz solely for examination and inspection by Meyrowitz's potential customer, and Meyrowitz, in the same agreement, promised to return the ring to Plaintiff upon demand.

Immediately after he received the Ring, Meyrowitz sent it to Biltmore. He told representatives of Biltmore that the ring, was owned by a man from Minnesota named Joseph Gutekunst, who desired to pawn it. Gutekunst, who had been Meyrowitz's friend for 30 years, then contacted Biltmore about pawning the ring. In March, 2015, Gutekunst consummated the pawn transaction, and received $1 million from Biltmore pledging the ring as collateral. In November 2015, Gutekunst and Biltmore agreed that Biltmore would buy the ring out of pawn for $1.3 million. Biltmore consummated the transaction by wiring Gutekunst an additional $250,000 and deeming the pawn loan, including unpaid interest, fully satisfied.

Meyrowitz deceived Mellen to hide his criminal conduct. For months after he received the ring he repeatedly told Mellen that the Ring was in his possession and promised to return it. In May 2015, Meyrowitz stopped responding to Plaintiff's calls and emails. In September 2015, Plaintiff sued Meyrowitz in state court in Florida seeking, *inter alia,* a writ of replevin to recover the ring.

On January 25, 2016, in response to multiple orders from the Florida court instructing him to disclose the location of the ring, Meyrowitz provided an affidavit falsely stating that it was in Gutekunst's possession in a Wells Fargo Bank safe deposit box in Mound, Minnesota. Simultaneously, Meyrowitz filed a motion in the Florida action to dismiss Plaintiff's replevin claim on the grounds that the court lacked jurisdiction to order seizure of the ring since the ring is no longer in Florida.

On January 29, 2016, Plaintiff commenced an action in the United States District Court for the District of Minnesota to recover the ring from Defendants Meyrowitz, Gutekunst and Wells Fargo Bank, N.A. ("Wells Fargo"). Plaintiff sought and obtained a temporary restraining order preventing all access to Gutekunst's safe deposit box and

directing Wells Fargo to inspect its contents. When that inspection occurred on February 22, 2016, Plaintiff discovered that Meyrowitz's declaration was false: the ring was not being held in a safe deposit box at Wells Fargo in Minnesota. Shortly after that, Plaintiff learned from law enforcement sources to whom the theft of the ring had been reported that the ring was in fact in Biltmore's possession.

Since Plaintiff's discovery that Biltmore has been in possession of the Diamond, Plaintiff has attempted to negotiate with Biltmore's attorney to ensure that the ring is not moved until a court rules upon Mellen's and Biltmore's competing claims of ownership. On March 2, 2016, Biltmore's attorney orally agreed that his client would retain possession of the Ring until this dispute was resolved. The next day, Biltmore's attorney sent an email confirming this. On March 4, 2016, Mellen's counsel sent Biltmore's counsel an "Agreement to Maintain the Status Quo" to formalize their agreement. Despite multiple requests by Plaintiff's counsel for Biltmore to execute this agreement and statements by Biltmore's counsel to the effect that Biltmore would agree to such a stipulation, Biltmore has not executed or in any way responded to the proposed stipulation. Plaintiff is left with no choice but to bring this motion in order to obtain a preliminary injunction from the Court enjoining Biltmore from moving the Diamond and ordering that the Diamond be held in the exclusive possession and control of Biltmore or a receiver appointed by the Court until further order of this Court.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

## **FACTUAL BACKGROUND**

Plaintiff, a diamond and jewelry dealer, is the owner of a heart-shaped diamond ring ("the Ring"). Declaration of Richard Mellen ("Mellen Decl.") dated March 30,2016 at ¶¶ 2-3. The center stone of the Ring is a rare and highly valuable 4.05 carat internally flawless fancy blue diamond. *Id*. A photograph of the Ring and a copy of the Colored Diamond Grading Report for the center stone issued by the Gemological Institute of America (commonly known as the "certificate") are annexed as Exhibit A to the Mellen Declaration.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

In January 2015, the Los Angeles diamond dealer from whom Mellen had bought the Ring two years earlier, contacted the President of Mellen Inc., Richard Mellen, and informed him that one Scott Meyrowitz was interested in taking the Ring "on memo" *Id.* at ¶ 3. The Los Angeles dealer claimed that he had done business with Meyrowitz for many years and vouched for his trustworthiness. *Id.*

It is customary in the wholesale diamond trade for dealers to give merchandise to each other pursuant to written memorandum agreements (known as giving merchandise "on memo"). *Id.* at ¶ 4. When merchandise is given to another dealer on memo, the recipient takes possession, but not title, to the merchandise in order to show it to potential customers. If the recipient has a customer who wants to buy the item, the recipient notifies the consignor (known as the "memo holder") that he has found a buyer and asks the memo holder to send him an invoice with agreed upon payment terms. *Id.* Any time before an invoice is paid, the recipient can return the merchandise to the memo holder, or the memo holder can demand return of the merchandise. *Id.* If the recipient of the merchandise fails to return the merchandise to the memo holder upon demand, pursuant to the memorandum he is required to pay the memo holder the price stated in the memorandum. *Id.*

In January 2015, Richard Mellen contacted Meyrowitz. Mellen Decl. ¶ 5. Meyrowitz represented to Mellen that he had a customer in Pittsburgh, Pennsylvania who might be interested in purchasing the Ring and asked Mellen to send him the Ring on memo. *Id.* To allay Mellen's concerns about where the Ring would be stored and how it would be insured, Meyrowitz told him that the Ring would be kept in a Wells Fargo Bank vault at a branch near his home in Florida and/or at a PNC Bank vault in Pittsburgh when it was being shown to the potential customer there. *Id.* at ¶ 6. Meyrowitz sent documents to Mellen showing that he had obtained insurance covering the Ring for up to $2 million while it was in these vaults. *Id.*

On January 23, 2015, Plaintiff shipped the ring to Meyrowitz after Meyrowitz, individually and on behalf of his company SSB International LLC, signed a memo

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

acknowledging that they had no right to sell the Ring and promising to return it to Mellen upon demand. Mellen Decl. ¶ 7-8, Ex. B. For the next two months, Mellen received periodic updates from Meyrowitz informing him that Meyrowitz's effort's with his potential customer were progressing. *Id.* at ¶ 9. At various times, Mellen was told that the Ring was in the Wells Fargo vault in Florida, that it had been shipped to the PNC vault in Pittsburgh, and that it had been returned to Florida. *Id.* ¶ 9-10. By late March, Mellen was becoming concerned because the insurance coverage procured by Meyrowitz had expired, and it was becoming increasingly difficult to get any information from Meyrowitz about the status of the Ring. *Id*..

On April 1, 2015 Meyrowitz told Mellen that he would ship the Ring back to Plaintiff via Brinks. Mellen Decl. at ¶ 10. He did not do so. Meyrowitz told Mellen that he had cancelled Brinks' scheduled pick-up of the Ring because he was not available to give it to the courier on that date. *Id.* He told Mellen that he would reschedule a new pick-up, but never did so. He provided Mellen with a series of stories and excuses about shipping the Ring back to Plaintiff in New York, but never sent it. Mellen Dec. ¶ 11, Ex. C (email exchanges between Mellen and Meyrowitz). On May 26, 2015, after further attempts at communication with Meyrowitz's proved fruitless, Mellen sent an email to Meyrowitz stating:

> Scott, It's been more than a month since you have contacted me directly regarding my merchandise which you initially took in late January. In the meantime the insurance you took out has lapsed and your own attorney is at a loss to explain your actions. Such being the case, I demand you send me back my 4ct Fancy Blue HS diamond ring before the end of the week.
>
> Richard Mellen.

*Id.* at ¶ 10, Ex. C p. 6.

Meyrowitz again promised to return the Ring, but did not. Meyrowitz then ceased answering Mellen's calls. He has had no communication with Mellen since May 2015. Meyrowitz has not returned the Ring nor has he paid for it. Mellen Decl. at ¶ 11.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

Through counsel, Mellen subsequently learned that Meyrowitz has a long history of taking merchandise from other jewelers on consignment and then not returning it. Declaration of Paul S. Hugel ("Hugel Decl.") ¶ 2. When Meyrowitz filed for a Chapter 13 bankruptcy in Texas in 2006, several jewelers filed papers indicating that Meyrowitz had taken merchandise from them and not returned it. *Id.* In one instance, Meyrowitz claimed that he was unable to comply with a state court order directing him to turn over three highly valuable diamonds he had taken from another jeweler because "foreign purchasers absconded" with them. *Id.* Mellen's counsel also learned that there was an unsatisfied IRS tax lien against Meyrowitz for $110,000. *Id.*

## THE FLORIDA ACTION

On September 28, 2015, Mellen commenced an action against Meyrowitz and his company SSB International LLC in the Circuit Court for the 15th Judicial Circuit in Palm Beach County, Florida, Case No. 502015CA010908XXXXMB(AJ) ("the Florida Action"). Hugel Decl. ¶ 3, Ex. A. In the Florida Action, Mellen seeks a writ of replevin to recover the Ring, and, in the alternative, damages for conversion, breach of contract, and fraud.

On January 11, 2016, the court in Florida ordered Meyrowitz to disclose the location of the Ring to Mellen. Hugel Decl. ¶ 4. After initially disregarding the court's order and being threatened with contempt, on January 25, 2016, Meyrowitz provided Mellen with an affidavit stating that, on Meyrowitz's behalf and at his direction, the Ring was being held at Wells Fargo in Mound, Minnesota by Defendant Joseph G. Gutekunst. Hugel Decl., Exh. B. In that same affidavit, Meyrowitz promised not to transfer the Ring until resolution of Mellen's Florida replevin claim. After claiming that the ring was in Minnesota, Meyrowitz filed a motion in the Florida Action to dismiss Plaintiff's replevin claim on the grounds that the court lacked subject matter jurisdiction to issue a writ of replevin since the Ring was no longer in Florida. Hugel Decl. ¶ 4.

On March 8, 2016, pursuant to a multiple court orders and under threat of sanctions, Meyrowitz appeared for a deposition in the Florida action. At the deposition,

Meyrowitz invoked his Fifth Amendment right against self-incrimination and refused to answer questions about the Ring. Hugel Decl. ¶ 10.

**THE MINNESOTA ACTION**

In January 2016, immediately after Meyrowitz claimed that Ring was in Gutekunst's possession, Plaintiff commenced an action in the United States District Court for the District of Minnesota to recover the ring from Defendants Meyrowitz, Gutekunst and Wells Fargo Bank, N.A. ("Wells Fargo"). *See* Case No. 0:16-cv-00206-DSD-FLN (the "Minnesota Action"). Plaintiff sought and obtained a temporary restraining order preventing all access to the safe deposit box and directing Wells Fargo to inspect its contents. Hugel Decl. ¶ 6. Unsurprisingly, when the inspection occurred on February 22, 2016, it was revealed that Meyrowitz's declaration turned out to be false. *Id.* The Ring was not being held in a safe deposit box at Wells Fargo in Minnesota. It was soon discovered that it had been in the possession of Biltmore for over a year.

**THE TRANSFER OF THE DIAMOND TO BILTMORE**

On or about March 2, 2016, Mellen's counsel learned from law enforcement sources to whom the theft of the Ring had been reported that the Ring was in Biltmore's possession. Hugel Decl. ¶ 7. Within days of obtaining the Ring from Mellen in January 2015, Meyrowitz sent it Biltmore. Hugel Decl. ¶ 8. According to Biltmore, Meyrowitz claimed that the Ring was owned by his friend Joseph Gutekunst who wanted a loan. After Meyrowitz sent the Ring to Biltmore, Gutekunst went to Biltmore to consummate the transaction. *Id.* On or about March 2, 2015, Gutekunst and Biltmore finalized the pawn transaction under which Biltmore loaned him $1 million. Hugel Decl., Exh D. Biltmore wired the $1 million to Gutekunst's bank account and took possession of the Diamond as collateral. *Id.* According to Biltmore, on or about November 2015, Gutekunst contacted Biltmore and asked to convert the pawn into an outright purchase of the Diamond. Hugel Decl. ¶ 9. Biltmore agreed to buy the Diamond from Gutekunst for $1.3 million. *Id.* On November 17, 2015, Biltmore funded the transaction by wiring

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

Gutekunst $250,000 and deeming the pawn loan, including accrued interest, as being satisfied. *Id*.

Since learning that the Ring was in Biltmore's possession, counsel for Mellen has had numerous telephone conferences with Biltmore's counsel, Thomas Baker ("Baker"), regarding the safekeeping of the ring, pending a resolution of this action. On March 2, 2016, Baker orally agreed that his client would retain possession of the Ring until this dispute was resolved. Hugel Decl. ¶ 11. The next day, Baker sent an email confirming this. *Id.* Exh. F On March 4, 2016, Mellen's counsel sent Baker an "Agreement to Maintain the Status Quo" to formalize their agreement. *Id.* Exh. G. Despite multiple requests by Plaintiff's counsel for Biltmore to execute this agreement and statements by Baker to the effect that Biltmore would agree to such a stipulation, Biltmore has not executed such a stipulation and its counsel has become unresponsive. Hugel Decl. ¶ 11.

## <u>ARGUMENT</u>

### I. A PRELIMINARY INJUNCTION IS WARRANTED

The Ninth Circuit has established the standard for considering preliminary injunctions. *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). The Court must consider: (1) the threat of irreparable harm to the moving party if an injunction is not granted; (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted; (3) the public interest; and (4) the probability that the moving party will succeed on the merits. *Id. See also* Fed. R. Civ. P. 65(a) & (b).

A district court has broad discretion when ruling on preliminary injunction requests. O*verstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005). "Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable successes on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tip in its favor." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir.2000); *accord Perfect 10, Inc. v. Amazon.com,*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

*Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id*.

For the reasons stated below, Plaintiff's request for a preliminary injunction satisfies each of the requisite factors.

**1. Plaintiff will be Irreparably Harmed Absent Injunctive Relief**

In this action, Plaintiff is primarily seeking a declaratory judgment for the Diamond, a unique 4.05 carat internally flawless fancy blue heart-shaped diamond. The fact that Plaintiff could obtain a money judgment against Meyrowitz in the Florida action and Defendant if the Ring disappeared does not eliminate the likelihood of irreparable harm absent an injunction. A claim for monetary damages does not preclude injunctive relief if the monetary damages would be inadequate to compensate the movant for its damages. *Chalk v. United States District Court Central District of California*, 840 F.2d 701, 708 (9th Cir.1988); *Save Our Summers v. Washington State Dep't of Ecology*, 132 F. Supp. 2d 896, 906 (E.D. Wash. 1999); *see also Coll. Craft Cos. v Perry*, 1995 US Dist LEXIS 19732, at *26, 1995 WL 783612 * 7, Civ. No. 3-95-583 (D. Minn. Aug. 9, 1995) ("The mere fact that an action for damages is available to the movant does not, necessarily, preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied its rights."). The threat that an award of money damages would likely be uncollectible can constitute irreparable harm. *See e.g.*, A Woman's Friend Pregnancy Res. Clinic v. Harris, No. 2:15-CV-02122-KJM-AC, 2015 WL 9274116, at *30 (E.D. Cal. Dec. 21, 2015) (finding irreparable harm where monetary damages were unrecoverable due to California's Eleventh Amendment sovereign immunity); *Perez-Funez v. Dist. Dir., I.N.S.*, 611 F. Supp. 990, 1003 (C.D. Cal. 1984); *Paramount Pictures Corp. v. Holden*, 166 F. Supp. 684, 690 (S.D. Cal. 1958). Even where money damages are available, an injunction to maintain the status quo is appropriate when the primary purpose of the action to obtain specific property that rightly belongs to plaintiff. *See Slidell, Inc. v Millennium Inorganic Chems., Inc.*, 2002 US Dist

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

LEXIS 7064, at *13, Civil No. 02-213 (D. Minn., Apr. 17, 2002) (JRT/FLN). As demonstrated by the numerous lawsuits filed against Meyrowitz, his 10-year-old bankruptcy case, and the unsatisfied federal tax lien filed against him, the chances of ever collecting a judgment from Meyrowitz are not great. Mellen's goal is not to obtain an award of damages against Meyrowitz or Defendant, and Mellen is not seeking money damages in this action except in the alternative if Mellen is unable to obtain the Ring itself.

Moreover, Plaintiff has been chasing the Diamond around the country and a preliminary injunction is needed to end this chase. Four months after Plaintiff sued Meyrowitz in Florida to obtain possession of the Ring, Meyrowitz stated, *for the first time*, that the Ring was no longer in Florida and moved to dismiss Plaintiff's replevin claim on those grounds. Plaintiff then sought out the Ring in Minnesota based on Meyrowitz's court-ordered affidavit that the Ring was in a safe deposit box there, only to discover that this was false. The wild goose chase should come to an end here.

Plaintiff is simply trying to recover its property that is known to currently be in the possession and control of Defendant. Any future order by the Court determining Plaintiff's right to the Ring may be ineffectual absent an injunction securing during the pendency of this action.

**2. The Balance of Harm Weights Heavily in Favor of Plaintiff**

Plaintiff is the owner of the Diamond. The only injunctive relief sought by Plaintiff is to confirm that the Diamond is actually in the possession of Biltmore and to make sure it remains secure pending a resolution of Mellen's declaratory judgment replevin claims. Biltmore has promised not to sell or transfer the Diamond pending resolution of Mellen's claims, so Biltmore cannot complain that it would be harmed by an injunction preventing it from doing the very thing it has promised not to do.

**3. The Public Interest Would be Served by the Issuance of Injunctive Relief**

The public has an interest in ensuring that it can look to the courts to protect property rights and resolve disputes over ownership. The theft of the Ring has already led

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

to multiple lawsuits in three different states. No public interest would be served by allowing the Diamond to be moved yet again, which would inevitably lead to multiplying the litigation further.

**4. Plaintiff is Likely to Succeed on the Merits of Its Claims**

First, there is no dispute that Plaintiff owns the Diamond. The contract under which Meyrowitz took possession of the Ring unambiguously shows that Plaintiff is the owner and that Plaintiff is entitled to return of the Diamond now in Defendant's possession. The Memorandum agreement signed by Meyrowitz states in relevant part:

> The merchandise described below, is delivered to you on memorandum, at your own risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, **upon the express condition that all such merchandise shall remain the property of BEN MELLEN & SONS, INC.[1], and shall be returned on demand, in its full and original form. . . You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise . . . . [This agreement] represents[s] the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealing with respect to other merchandise or any contrary custom of the trade**.

Mellen Decl., Exh. B. (emphasis added).

Meyrowitz did not own the Ring nor did he have any power to pawn or sell it. This is doubly true of Gutekunst, the person from whom Biltmore claims to have acquired title to the Ring.

Replevin is the appropriate means to recover possession of personal property of definite things and a means to determine the right of possession of personal property or the title thereto. *See* A.R.S. § 12-1310 *et seq.*; *see, e.g., Schoolhouse Educ. Aids, Inc. v. Haag*, 145 Ariz. 87, 89, 699 P.2d 1318, 1320 (App. 1985); *United Producers & Consumers Co-op., Inc. v. O'Malley*, 103 Ariz. 26, 27, 436 P.2d 575, 576 (1968). As there can be no legitimate dispute that Plaintiff is the owner of the Diamond with a right to possession superior to that of the Defendant, Plaintiff is likely to prevail on the merits of its replevin and conversion claims.

---

[1] At the time the Memorandum was signed Plaintiff Mellen Inc. was named Ben Mellen & Sons, Inc. It changed its name to Mellen Inc. on May 7, 2015.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

All four factors weigh in favor of granting the requested preliminary injunction. The balance of equities heavily favors Mellen and requires the Court to intervene to preserve the status quo until the merits are determined.

**II. NO BOND IS NECESSARY**

The Diamond is demonstrably Plaintiff's, and Defendant has no rights to take any action with respect to the Diamond. No bond is necessary in this situation because the Diamond will not move from Defendant's possession. Plaintiff is not seeking to obtain possession of the Diamond before its claims are fully adjudicated. Plaintiff only seeks to maintain the *status quo* until the Court can adjudicate the parties competing claims of ownership in the Diamond.

**CONCLUSION**

For the reasons stated herein, Plaintiff respectfully requests that the Court issue a preliminary injunction, (1) prohibiting Defendant from selling, transferring or moving the Diamond until resolution of Plaintiff's claims or further order of this Court; (2) ordering Defendant to hold the Diamond in its exclusive control and possession pending a determination of Plaintiff's claims or upon further order of the Court.

DATED this 31st day of March, 2016.

BALLARD SPAHR LLP

By: ______________________________
Craig Solomon Ganz
Michael S. Myers
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555

Paul S. Hugel (admitted *pro hac vice*)
CLAYMAN & ROSENBERG, LLP
305 Madison Ave - Suite 1301
New York, NY 10165

*Attorneys for Plaintiff*