**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mellen Incorporated, | No. CV-16-00648-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Biltmore Loan and Jewelry - Scottsdale LLC, | |
| Defendant. | |

This case involves a dispute over the ownership of a 4.05 carat blue heart-shaped diamond worth approximately $2 million.  Plaintiff moves to preliminarily enjoin Defendant from selling, moving, or otherwise transferring the diamond pending the resolution of this action.  Doc. 13.  The Court held oral argument on the motion on June 1, 2016.  For the reasons below, the motion is granted.

## BACKGROUND

For purposes of the preliminary injunction motion, the following facts are undisputed unless otherwise noted.  In June 2013, Plaintiff Mellen Incorporated acquired a rare 4.05 carat internally flawless fancy blue heart-shaped diamond ring valued at approximately $2 million.  Doc. 15, ¶ 3.  In January 2015, Mellen received a call from the diamond dealer from whom it had purchased the ring.  The dealer informed Mellen that Scott Meyrowitz, a diamond dealer from Florida, was interested in taking the ring "on

memo" from Mellen to show to a potential buyer. *Id.*[1] Because the dealer vouched for Meyrowitz, Mellen contacted Meyrowitz via telephone. *Id.*, ¶ 5. Meyrowitz stated that he had a customer in Pittsburgh interested in purchasing the ring. *Id.* The parties agreed that the memorandum price would be $2 million, and Meyrowitz provided proof of insurance to cover the ring. *Id.*, ¶¶ 5-6. Meyrowitz assured Mellen that he would keep the ring in a vault at Wells Fargo Bank in Florida and would remove it to only to show to customers. *Id.*, ¶ 6. With these assurances, Mellen sent the ring to Meyrowitz via Brinks transport. *Id.*, ¶ 8.

Over the course of the next two months, Mellen periodically contacted Meyrowitz to inquire about the status of the ring. *Id.*, ¶ 9. At one point, Meyrowitz stated that a sale was imminent and that the ring was on its way to Pittsburgh for the customer to inspect. *Id.* No sale ever occurred, however, and after several weeks, it became increasingly difficult to get a response from Meyrowitz. *Id.* Eventually, Mellen demanded return of the ring, and Meyrowitz stated that he would ship it back to New York. *Id.*, ¶ 10. In May 2015, Meyrowitz ceased contact with Mellen, failed to return the ring, and failed to pay the memorandum price. *Id.*, ¶ 11.

Unbeknownst to Mellen, once Meyrowitz received the ring, he immediately contacted David Goldstein of Defendant Biltmore Loan and Jewelry – Scottsdale LLC ("Biltmore"). Doc. 24 at 5.[2] Meyrowitz told Goldstein that he knew someone who wanted to pawn a diamond and asked whether Goldstein was interested. *Id.* Shortly thereafter, Joseph Gutekunst called Goldstein and discussed pawning the diamond he

---

[1] In the diamond trade, it is customary to "give merchandise to each other pursuant to written memorandum agreements (known as giving merchandise 'on memo')." Doc. 15, ¶ 4. In such an arrangement, the recipient takes possession, but not title, so that the merchandise can be shown to potential customers. *Id.* "If the recipient's customer wants to buy the item, the recipient notifies the consignor (known as the 'memo holder') that he has found a buyer and asks the memo holder to send him an invoice with agreed upon payment terms." *Id.* The transaction may be cancelled at any time before the invoice is paid, and if the recipient fails to return the item, he is liable to the memo holder for the amount stated in the memorandum. *Id.*

[2] Goldstein states that he has known and dealt with Meyrowitz for over twenty years. Doc. 24-2, ¶ 4.

owned.  *Id.*  Goldstein believed Gutekunst owned the diamond and that Meyrowitz was "brokering the diamond ring for Mr. Gutekunst."  Doc. 24-2, ¶ 6.  Goldstein asserts that Meyrowitz told him that Gutekunst "had two diamonds and that Mr. Gutekunst needed money for the expansion of his business."  *Id.*  Goldstein believed that Gutekunst was in the vitamin business and that Gutekunst had purchased the diamond from Meyrowitz.  *Id.*

On February 2, 2015, the ring was delivered to Biltmore from a Wells Fargo bank in Florida, "rather than [from] Mr. Gutekunst's home state [of] Minnesota."  Doc. 24 at 5. Goldstein examined the ring and requested a current Gemological Institute of America (GIA) certificate.  *Id.*  On February 20, 2015, Meyrowitz sent the new GIA certificate to Goldstein.  *Id.* at 6.  On February 26, 2015, Goldstein received a shipment containing only the diamond—the ring mount was no longer included.  *Id.*  Nevertheless, Goldstein and Gutekunst agreed that Gutekunst would pledge the diamond to Biltmore for a $1 million loan.  *Id.*  Gutekunst traveled to Scottsdale to sign the pawn contract, and on March 4, 2015, Biltmore wired $1 million to a bank account designated by Gutekunst. *Id.* at 7.[3]  In October 2015, Gutekunst offered to sell the diamond outright for an additional $250,000.  *Id.* at 8.  On November 17, 2015, Biltmore wired $250,000 to a bank account designated by Gutekunst.  *Id.*

In March 2016, Goldstein took the diamond to a trade show and located a buyer willing to pay $1.625 million for the diamond.  *Id.*, ¶ 12.  The buyer requested a current GIA certificate, but by that time, GIA had "red-flagged" the diamond because Mellen had reported it stolen to law enforcement.  *Id.*  Consequently, the buyer backed out.  *Id.*

On September 28, 2015, Mellen filed suit against Meyrowitz and his company SSB International LLC in Florida state court seeking a writ of replevin to recover the ring.  Doc. 13 at 6.  On January 11, 2016, the Florida court ordered Meyrowitz to disclose the location of the ring to Mellen.  *Id.*  After being threatened with contempt, Meyrowitz stated that Gutekunst was holding the ring in a safe deposit box at a Wells Fargo Bank in

---

[3]  Biltmore had to take out a loan to fund the $1 million loan it extended to Gutekunst.  Doc. 24 at 7.  The loan has an interest rate of 4.25%.  Doc. 24-2, ¶ 10.

Minnesota. *Id.* Meyrowitz promised not to transfer the ring. *Id.* Immediately thereafter, Mellen filed suit in Minnesota to recover the ring and obtained a temporary restraining order preventing either Gutekunst or Meyrowitz from accessing the safe deposit box. *Id.* at 7. When Mellen inspected the safe deposit box, however, the ring was gone. *Id.* In March 2016, under threat of sanctions, Meyrowitz appeared at a deposition but invoked his Fifth Amendment right against self-incrimination. *Id.* at 6-7. On March 2, 2016, Mellen finally learned from law enforcement that the ring was in Biltmore's possession. *Id.* at 7. Both Mellen and Biltmore claim ownership of the diamond.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements are balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134-35 (9th Cir. 2011). However, the sliding-scale approach does not relieve the movant of the burden to satisfy all four prongs for the issuance of a preliminary injunction. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

## ANALYSIS

Mellen seeks to enjoin Biltmore from moving or selling the diamond. It also seeks an order requiring the diamond to be held in the exclusive possession and control of Biltmore or a court-appointed receiver during the pendency of this action. Mellen has the

burden of demonstrating each of the four elements necessary to obtain preliminary injunctive relief.  The Court finds Mellen has met its burden.

## I. Likelihood of Success on the Merits

Mellen argues that the memorandum under which Meyrowitz took possession of the diamond "unambiguously shows that [Mellen] is the owner" of the diamond.  Doc. 13 at 11.  The memorandum signed by Meyrowitz states:

> The merchandise described below, is delivered to you on memorandum, at your own risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of [Mellen], and shall be returned on demand, in its full and original form. . . .  You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise . . . .

Doc. 15-2 at 2.

Biltmore argues Article 2 of the Uniform Commercial Code (U.C.C.)[4] governs the dispute.  It asserts the memorandum is irrelevant because it is a good faith purchaser of the diamond under U.C.C. § 2-403(1).[5]  Alternatively, it asserts that Mellen entrusted the diamond to Meyrowitz, thereby providing him the power to transfer all of Mellen's rights in the diamond to Biltmore under § 2-403(2).

### A. Section 2-403(1) Likely Does Not Protect Biltmore's Purchase

Biltmore asserts that Meyrowitz obtained voidable title to the diamond under a "transaction of purchase," and therefore, as a subsequent good faith purchaser, Biltmore holds good title to the diamond.  Section 2-403(1) provides, in relevant part:

> A purchaser of goods acquires all title which is his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased.  A person with voidable title has power to transfer a good title to a good faith purchaser for value.  When

---

[4] Article 2 of the U.C.C. governs "transactions in goods."  U.C.C. § 2-102.  The diamond is a "good" within the meaning of Article 2.  § 2-105(1).

[5] Arizona has adopted the relevant provisions of the U.C.C. at issue in this case. *See* A.R.S. § 47-2403.

- 5 -

goods have been delivered under a transaction of purchase the purchaser has such power even though . . . the delivery was procured through fraud punishable as larcenous under the criminal law.

U.C.C. § 2-403(1).  "Transaction of purchase" has been described by the Fifth Circuit as

generally limited to those situations in which the party who delivered the goods to the subsequent seller intended, however misguidedly, that the seller would become the owner of the goods.  Thus, the con artist who fraudulently induces a manufacturer to deliver goods to him by means of a forged check has voidable title because he obtained delivery through a transaction of purchase, even though the defrauded manufacturer could bring criminal charges against the con artist; under section 2-403(1), the defects in the con artist's voidable title would be cured by a sale to a good faith purchaser for value, and the good faith purchaser would obtain clear title, free from any claims of the manufacturer.  *But if the con artist merely converts the goods to his own use after having obtained possession of them in some manner other than through a transaction of purchase, he does not even have voidable title; instead, he has void title, and cannot pass good title even to a good faith purchaser for value.*

*Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 268 (5th Cir. 1981) (emphasis added).

Here, the record establishes that Meyrowitz obtained possession of the diamond via "some manner other than through a transaction of purchase." *Id.*  The memorandum executed between Mellen and Meyrowitz expressly states that the diamond "shall remain the property of [Mellen]" and that Meyrowitz "acquire[s] no right or authority to sell, pledge, hypothecate or otherwise dispose of" the diamond.  Doc. 15-2 at 2.  It also provides:  "This is NOT an INVOICE or BILL of Sale."  *Id.*  This language indicates that Mellen never intended Meyrowitz to become the owner of the diamond.  Indeed, at least two courts have held this same language precludes a "transaction of purchase" in the wholesale diamond market.  *See Zaretsky v. William Goldberg Diamond Corp.*, --- F.3d ---, No. 15-35, 2016 WL 1594595, at *10 (9th Cir. April 21, 2016) (finding that because the terms of the consignment agreement provided that the consignee "acquire[d] no right or authority to sell, pledge, hypothecate or otherwise dispose" of the diamond, no "transaction of purchase" occurred and consignee "could not pass good title to

subsequent bona fide purchasers for value"); *Kimberly & Eur. Diamonds, Inc. v. Burbank*, 684 F.2d 363, 366 (6th Cir. 1982) (memorandum agreement stating that consignee "acquire[d] no right or authority to sell, pledge, hypothecate or otherwise dispose" of the diamond evidences that consignee "had no title, nor did she have authority to pass title to [subsequent purchaser]").   Therefore, in light of the memorandum, Meyrowitz held no title to the diamond, could not pass good title to a subsequent purchaser, and it is likely that Biltmore's purchase is not protected by § 2-403(1).[6]

## B.  Section 2-403(2) Likely Does Not Protect Biltmore's Purchase

Biltmore also asserts that Meyrowitz held voidable title to the diamond because Mellen entrusted it to Meyrowitz.  It argues, therefore, that Meyrowitz could convey good title to subsequent purchasers in the ordinary course of business, such as Biltmore. Section 2-403(2) provides that "[a]ny entrusting of possession of goods to a merchant who deals in good of the kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."  U.C.C. § 2-403(2).  "'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties . . . and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."  U.C.C. § 2-403(3).  "The purpose of the entruster provision is to enhance the reliability of commercial sales by merchants . . . by shifting the risk of resale to one who leaves his property with [a] merchant."  *Galin v. Hamada*, No. 15-CV-6992 (JMF), 2016 WL 2733132, at *1 (S.D.N.Y. May 10, 2016) (internal quotation marks omitted).  Furthermore, "it is well settled that U.C.C. § 2-403(2) protects only persons who buy in the ordinary course out of inventory."  *Evergreen Mar. Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 97 n.8 (1st Cir. 1993).

---

[6] Biltmore argues, albeit unclearly, that Gutekunst acted as agent of Meyrowitz, or vice versa.  Doc. 39 at 4-6.  But this does not change the result under § 2-403(1).  As agent, Gutekunst would only be able to transfer the title held by his principal, nothing more.  Because Meyrowitz could not transfer valid title under § 2-403(1), neither could Gutekunst.

### 1.  Biltmore is Likely Not a Buyer in the Ordinary Course

A buyer in the ordinary course of business "means a person that buys in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind."   U.C.C. § 1-201(9).   It "does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt."  *Id.*

For Biltmore to qualify as a "buyer in the ordinary course of business," it must have purchased the diamond *from the merchant to whom the property was entrusted*." *Porter v. Wertz*, 421 N.E.2d 500, 501 (N.Y. 1981) (emphasis added).  But it is undisputed that (1) Gutekunst sold the diamond to Biltmore, (2) Mellen did not "entrust" the diamond to Gutekunst, and (3) Gutekunst is not a merchant.[7]   Biltmore believed Gutekunst owned the diamond and that Meyrowitz was merely acting as broker. Gutekunst made the sale in person, signed the forms, and did not otherwise indicate he was acting on behalf of Meyrowitz.  Biltmore also believed Gutekunst was in the vitamin business and that he was selling the diamond to expand his vitamin business.  Based on these undisputed facts, the Court concludes Biltmore likely did not purchase the diamond from "a person . . . in the business of selling goods of that kind," i.e., a diamond merchant.[8]

In addition, the manner of the transaction indicates that it was not made in the ordinary course of business.  "A person buys goods in the ordinary course if the sale to

---

[7] Via the memorandum, Mellen delivered and acquiesced possession of the diamond to Meyrowitz in order to display it to potential buyers.  Consequently, regardless of the memorandum's terms and Meyrowitz's ill intent, this constitutes "entrusting" within the meaning of §2-403(3).  Because Meyrowitz is a merchant who deals in goods of the kind who was entrusted with the diamond, he possessed the ability to transfer all rights of Mellen in the diamond to a buyer in the ordinary course of business.  § 2-403(2).  Meyrowitz, however, did not sell the diamond to Biltmore.

[8] The result would be no different if Gutekunst purchased the diamond from Meyrowitz before selling it to Biltmore.  First, Gutekunst would likely not qualify as a good faith buyer without knowledge that the sale violates the rights of another under § 1-201(9) because he is alleged to have conspired with Meyrowitz to misappropriate the diamond from Mellen.  Second, Biltmore knew Gutekunst was not a diamond merchant.

the person comports with the *usual or customary practices in the kind of business in which the seller is engaged* or with the seller's own usual or customary practices." U.C.C. § 1-201(9) (emphasis added).  For example, "[a] person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind."  *Id.*  Setting aside the fact that Biltmore purchased a rare diamond from a man that it knew was a vitamin salesman, the Court finds unlikely that it is customary or usual for diamond merchants to pawn rare stones at substantial losses.  The diamond at issue here is believed to be worth upwards of $2 million, but Gutekunst pawned it for half its value.  Even after Biltmore purchased it outright for an additional $250,000, the sale price was still well below the diamond's alleged market value.  Therefore, the Court finds this transaction likely does not qualify as taking place in the ordinary course of business, and Biltmore's purchase is likely not protected under § 2-403(2).[9]

## 2. Agency

Biltmore argues Gutekunst acted as an agent of Meyrowitz, or vice versa.  Doc. 39 at 4-6.  But it does not explain how this would affect the analysis under § 2-403(2).  Even assuming Meyrowitz and Gutekunst engaged in some type of principal-agent relationship, the Court is unconvinced the outcome would be different.  The facts indicate that (1) Biltmore believed Gutekunst owned the diamond; (2) Biltmore knew Gutekunst was a vitamin salesman, not a diamond merchant; and (3) that diamond merchants do not, in the ordinary course of their business, pawn valuable diamonds at a substantial loss.  These realities preclude Biltmore from attaining status as a buyer in the ordinary course of business.  Consequently, it is likely that any agency relationship between Meyrowitz and Gutekunst does not affect the analysis under the relevant U.C.C. provisions.[10]

---

[9] In addition, Biltmore acquired the diamond as security for the $1 million it extended to Gutekunst.  When Biltmore decided to purchase the diamond, it forgave the $1 million loan and nearly $50,000 of interest that had accrued, and paid an additional $250,000.  Because a buyer in the ordinary course does not include "a person that acquires goods . . . as security for . . . a money debt," Biltmore also may not qualify for protection under § 2-403(2) for this reason.

[10] At oral argument, Biltmore raised several new theories as to how an agency relationship would affect the outcome.  However, these arguments did not appear in

**II.  Irreparable Harm**

Mellen bears the burden of establishing that it likely will suffer irreparable harm in the absence of a preliminary injunction.  *See Winter*, 555 U.S. at 21-23.  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Mellen argues it will likely suffer irreparable harm because it "has been chasing the Diamond around the country and a preliminary injunction is needed to end this chase."  Doc. 13 at 10.  Mellen asserts the diamond is unique and cannot be adequately valued via a grading report—it must be graded in person.  Doc. 34 at 9.  Therefore, if Biltmore were allowed to sell it, Mellen may never have the chance to recover the diamond and its true value may never be ascertained.  *Id.*  On the other hand, Biltmore asserts money damages are adequate to compensate Mellen given that Biltmore found a buyer willing to pay $1.625 million.  Doc. 24 at 11.  It further argues the diamond has no sentimental value to Mellen and that Mellen was looking to sell the diamond anyway.

The Court finds Mellen has demonstrated that it will likely suffer irreparable harm if a preliminary injunction is not entered.  Mellen provided evidence that the diamond in this case is not merely a commodity like other non-colored diamonds via the declaration of Richard Mellen.  Doc. 35, ¶ 2.  Mellen states that the diamond is considered a "fancy color" and is extremely rare.  *Id.*, ¶ 3.  The market for such diamonds is "quite small," and to "obtain the best price for one of these diamonds, a seller must have both great knowledge of the marketplace and great patience."  *Id.*  Mellen further states that he "would not even seriously consider" an offer to purchase the diamond for $1.625 million.  *Id.*, ¶ 5.  Biltmore does not dispute the uniqueness and rarity of the diamond.  And the fact that Mellen wanted to display the diamond to a prospective buyer does not undermine the diamond's unique value, especially given Mellen's testimony that

Biltmore's brief, Mellen has not had a chance to respond, and thus the Court will not address them.

1    the value of such a diamond increases approximately 15% each year. *Id.* Biltmore's

2    argument that damages in the amount of $1.625 million would adequately compensate

3    Mellen for the diamond is unpersuasive.

4            Accordingly, given that Mellen seeks return of a specific, rare item, the value of

5    which is not readily determinable, it is likely that Mellen will be irreparably harmed if

6    Biltmore is able to sell the diamond before its rightful owner is identified.

7    **III.  Balance of Equities and the Public Interest**

8            The Court finds that the balance of equities favors Mellen.  Mellen entrusted the

9    diamond to a diamond merchant whom another reputable diamond merchant

10   recommended to Mellen.  Mellen had no knowledge or reason to believe Meyrowitz

11   would abscond with the diamond.  An injunction will provide Mellen the opportunity to

12   establish that it is true owner of the diamond.  On the other hand, Biltmore will continue

13   to incur interest on the loan it took out to fund the loan to Gutekunst.  It will also be

14   prohibited from selling the diamond.  But Biltmore admits it has known Meyrowitz for

15   over twenty years, though it denies knowledge of his transgressions.[11]  In addition, it

16   decided to enter into a pawn transaction with an individual that it knew was a vitamin

17   salesman, not a diamond merchant, for a rare 4.05 carat blue, heart-shaped diamond

18   worth nearly $2 million.  Mellen stands to lose its claim on a unique diamond, while

19   Biltmore will merely incur additional interest on its loan during this litigation.  The

20   balance tips in favor of Mellen.

21           The Court also finds that the public interest favors a preliminary injunction.  The

22   public has a great interest in maintaining the status quo pending the determination of the

23   lawful owner of a valuable and precious item.  Preventing a party from selling an item

24   with disputed ownership serves this interest.

25   **IV.  Bond**

26           Mellen has established a likelihood of success on the merits, irreparable harm, and

27

28           [11] Mellen later discovered that Meyrowitz had filed for bankruptcy in 2006, during which several individuals came forward alleging that Meyrowitz had misappropriated their diamonds.  Doc. 13 at 6.

that the balance of equities and public interest favor injunctive relief.  The Court therefore grants Mellen's request for a preliminary injunction and enjoins Biltmore from moving, selling, transferring or otherwise disposing of the diamond at issue in this case.  Biltmore must hold the diamond in its exclusive possession during the pendency of this action.

The Court is mindful, however, of the potential harm to Biltmore, especially should it establish that it is rightful owner of the diamond.  Biltmore borrowed money to fund its purchase of the diamond.  Doc. 24-2, ¶ 10.  It continues to pay down the loan, but cannot sell the diamond.  In order to accommodate the potential burden faced by Biltmore, the Court will require bond based on the price Biltmore had been offered to sell the diamond multiplied by the interest rate it is paying on the loan it acquired to purchase the diamond.  This amounts to $69,092.50, and will adequately compensate Biltmore should it prevail in this litigation.

**IT IS ORDERED** that Mellen's motion for preliminary injunction, Doc. 13, is **GRANTED**.  Until further order of the Court, Biltmore must maintain exclusive possession of the diamond and may not sell, transfer, move or otherwise dispose of it.  In addition, within 14 days of the date of this Order, Mellen shall post bond in the amount of $69,092.50 in accordance with Fed. R. Civ. P. 65(c).

Dated this 3rd day of June, 2016.

Douglas L. Rayes
United States District Judge

- 12 -