**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mellen, Inc., a New York corporation,<br><br>   Plaintiff/Counterdefendant,<br><br>v.<br><br>Biltmore Loan and Jewelry-Scottsdale, LLC, an Arizona limited liability company,<br><br>   Defendant/Counterclaimant. | No. CV-16-00648-PHX-DLR<br><br>**ORDER** |
| Biltmore Loan and Jewelry-Scottsdale, LLC, an Arizona limited liability company,<br><br>   Third-Party Plaintiff,<br><br>v.<br><br>SSB International, a Florida limited liability company; Scott Meyrowitz, an individual; and Joseph Gutekunst, an individual,<br><br>   Third-Party Defendants. | |

   This case was brought to determine ownership of a four-carat blue diamond worth nearly $2 million. Plaintiff Mellen, Inc. bought the diamond in 2013. Two years later, Defendant Biltmore Loan and Jewelry obtained the diamond through a pawn transaction and subsequent purchase.

   On March 8, 2016, Mellen filed a complaint against Biltmore asserting claims for declaratory judgment, replevin, and conversion. (Doc. 1.) Biltmore has alleged slander

and tortious interference counterclaims. (Doc. 61.) In June 2016, the Court issued a preliminary injunction enjoining the sale or transfer of the diamond pending resolution of this case. (Doc. 54.) The diamond presently is stored by Biltmore in a safe deposit box at a local bank. (Docs. 85, 91.)

Before the Court are cross motions for summary judgment. (Docs. 123, 126.) The motions are fully briefed. (Docs. 135, 139, 141, 149.) The Court heard oral argument on March 22, 2017. (Doc. 151.) For reasons that follow, Mellen's motion is granted in part and Biltmore's motion is denied.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material, and only disputes "over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## **BACKGROUND**

For purposes of the summary judgment motions, the following facts are not genuinely disputed. Mellen is a wholesale diamond dealer specializing in colored and other high-quality diamonds. In June 2013, Mellen acquired the diamond at issue – a flawless, four-carat blue heart-shaped stone – by purchasing it from another diamond dealer in California.

On January 23, 2015, Mellen and a diamond dealer from Florida, Scott

Meyrowitz, entered into a memorandum agreement concerning a potential future sale of the diamond. Pursuant to its terms, the diamond was given to Meyrowitz "on memo," which is a customary practice in the diamond trade. (*See* Doc. 54 at 2 n.1.) The memo provides, in pertinent part (Doc. 1 at 9):

> The merchandise described below, is delivered to you on *memorandum* . . . [and] only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of [Mellen], and shall be returned on demand, in full in its original form. . . . You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise, or any part thereof, by memorandum or otherwise. . . . A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received from us a separate invoice. . . . (This is NOT an INVOICE or BILL of Sale).

Meyrowitz received the diamond on January 26, 2015.

About two months earlier, Meyrowitz had reached out to the owner of Biltmore, David Goldstein, regarding a potential $1 million loan with the diamond as collateral. Meyrowitz thereafter introduced Goldstein to Joe Gutekunst, who purported to own the diamond and expressed interest in pawning it for $1 million. Goldstein and Gutekunst spoke about the pawn transaction the same day Meyrowitz entered into the memo with Mellen.

The transaction between Goldstein and Gutekunst was completed on March 2, 2015, the terms of which are set forth in a pawn ticket signed by Gutekunst. Biltmore wired the $1 million to Gutekunst the next day, and he immediately transferred $955,000 to Meyrowitz. Biltmore bought the diamond outright from Gutekunst on November 18, 2015, for a sale price of $1.3 million. This suit followed several months later to determine lawful ownership of the diamond.

## **DISCUSSION**

It is undisputed that Mellen owned the diamond when it was given to Meyrowitz on memo. Mellen argues that neither Meyrowitz nor Gutekunst acquired any ownership rights in the diamond, and Biltmore cannot show that it obtained good title to the diamond as a good faith purchaser for value or through an entrustment or consignment

under the Uniform Commercial Code (U.C.C.).  Mellen further argues that Biltmore's counterclaims for slander and tortious interference fail as a matter of law because Mellen is the true owner of the diamond.

Biltmore initially asserted that the dispute is governed by Article 2 of the U.C.C., which covers transactions in goods by merchants.  Biltmore argued that it had good title to the diamond under both the "good faith purchaser rule" provided in U.C.C. § 2-403(1) and the "entrustment rule" set forth in § 2-403(2).  Biltmore now takes the position that Article 9 of the U.C.C., which covers secured transactions, governs the dispute.  Biltmore argues that Mellen's delivery of the diamond to Meyrowitz constitutes a consignment under § 9-201 and Biltmore therefore has good title to the diamond as a purchaser for value of goods from a consignee under § 9-319.  Despite taking the position that Article 9 controls, Biltmore does not waive any prior arguments made under Article 2.  The Court therefore will address the arguments made under each article.[1]

**I.  Biltmore Did Not Obtain Good Title to the Diamond Under U.C.C. § 2-403(1)**

Relying on the good faith purchaser rule, Biltmore argues that it has good title to the diamond because Meyrowitz obtained voidable title through a "transaction of purchase" under U.C.C. § 2-403(1).  That section provides, in pertinent part:

> A person with voidable title has power to transfer good title to a good faith purchaser for value.  When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . the delivery was procured through fraud[.]

U.C.C. § 2-403(1)(d).  Mellen argues, correctly, that § 2-403(1) does not apply because neither Meyrowitz nor Gutekunst obtained the diamond under a transaction of purchase.

A transaction of purchase is limited to those situations in which a person delivers goods "intending for the subsequent seller to be the owner of the goods." *Touch of Class Leasing v. Mercedes-Benz Credit*, 591 A.2d 661, 667 (N.J. Super. Ct. App. Div. 1991).  "Applying that definition to the case at bar, no 'transaction of purchase' occurred because

---

[1] Arizona, where Biltmore is located, has adopted the relevant provisions of the U.C.C. at issue in this case, as has New York where Mellen resides.  *See* A.R.S. §§ 47-2403, 47-9102(A)(20), 47-9319; N.Y. UCC §§ 2-403, 9-102(20), 9-319.

- 4 -

it is clear from the record that [Mellen] never intended for [Meyrowitz] to become the owner of the [d]iamond." *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 525 (2d Cir. 2016). Rather, Mellen gave it to Meyrowitz "on memo," and the express terms of the agreement preclude the finding that Meyrowitz was to have an ownership interest in the diamond.

The diamond was given to Meyrowitz "only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of [Mellen]." Meyrowitz "acquire[d] no right or authority to sell, pledge, hypothecate or otherwise dispose of the [diamond], or any part thereof, by memorandum or otherwise[.]" A sale of the diamond could occur "only if and when [Mellen] agree[d] and [Meyrowitz] shall have received from [Mellen] a separate invoice." The diamond was to be returned to Mellen "on demand, in full in its original form." The memo concludes by making clear that it "is NOT an INVOICE or BILL of Sale[.]" (Doc 1 at 9.)

In short, the memo could not be more explicit that the transaction between Mellen and Meyrowitz was not one of "purchase." Stated differently, in delivering the diamond to Meyrowitz on memo, Mellen never intended for him to become the owner of the diamond. Thus, even if Biltmore was a good faith purchaser for value, any title Meyrowitz might have had in the diamond was void, not voidable, and good title could not pass to Biltmore under § 2-403(1). *See Zaretsky*, 820 F.3d at 525.

The Fifth Circuit made this clear in *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248 (5th Cir. 1981). The court explained that a "transaction of purchase" occurs where the deliverer of the goods intended, however misguidedly, that the subsequent seller would become the owner of the goods. 643 F.2d at 268. Thus, "the con artist who fraudulently induces a manufacturer to deliver goods to him by means of a forged check has voidable title because he obtained delivery through a transaction of purchase[.]" *Id.* Under § 2-403(1), "the defects in the con artist's voidable title would be cured by a sale to a good faith purchaser for value, and the good faith purchaser would obtain clear title[.]"

Where the con artist, however, "merely converts the goods to his own use after having obtained possession of them in some manner other than through a transaction of purchase, he does not even have voidable title; *instead, he has void title, and cannot pass good title even to a good faith purchaser for value*." *Id.* (emphasis added). This is because a "purchaser of goods acquires [only the] title which his transferor had or had power to transfer[.]" U.C.C. § 2-403(1).

Here, there is no genuine dispute that Meyrowitz obtained possession of the diamond via "some manner other than through a transaction of purchase." *Am. Standard*, 643 F.2d at 268. The record shows that in giving the diamond to Meyrowitz on memo, Mellen never intended for Meyrowitz (or Gutekunst) to become the owner of the diamond, and Mellen reserved unilateral authority to determine whether a future sale of the diamond would occur. This is clear on the face of the memo, and courts interpreting similar language have found that it precludes a "transaction of purchase" in the wholesale diamond market. *See Zaretsky*, 820 F.3d at 525 (finding that because the memo stated that the possessor of the diamond "acquire[d] no right or authority to sell, pledge, hypothecate or otherwise dispose" of the diamond, no transaction of purchase occurred and he "could not pass good title to subsequent bona fide purchasers for value under section 2-403(1)"); *Kimberly & European Diamonds, Inc. v. Burbank*, 684 F.2d 363, 366 (6th Cir. 1982) (memo stating that the possessor of the diamond "acquire[d] no right or authority to sell, pledge, hypothecate or otherwise dispose" of the diamond shows that she "had no title, nor did she have authority to pass title to [the subsequent buyer]").

Because Meyrowitz did not obtain the diamond through a "transaction of purchase," he had only void title to the stone and could not pass good title to Biltmore even it was a good faith purchaser for value. Thus, Biltmore's "attempt to shoehorn [its] case within the confines of section 2-403(1) fails." *Zaretsky*, 820 F.3d at 526.

**II. Biltmore Did Not Obtain Good Title to the Diamond Under U.C.C. § 2-403(2)**

Section 2-403(2) of the U.C.C. is known as the "entrustment rule." The section provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods

of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." U.C.C. § 2-403(2). The entrustment rule "is designed to enhance the reliability of commercial sales by merchants (who deal with the kind of goods sold on a regular basis) while shifting the risk of loss through fraudulent transfer to the owner of the goods, who can select the merchant to whom he entrusts his property." *Porter v. Wertz*, 421 N.E.2d 500, 500-01 (N.Y. Ct. App. 1981). In order for the buyer to have good title under § 2-403(2), three conditions must be met: (1) the goods must be entrusted to a merchant, (2) the merchant must deal in goods of that kind, and (3) the buyer must purchase the goods from the merchant in the ordinary course of business. U.C.C. § 2-403(2).

For example, if the owner of a new car takes it back to the dealership for service and the dealer puts it on the car lot and sells it to an unsuspecting buyer, the entrustment rule would give good title to the buyer. The original owner, of course, would have various claims for damages against the dealership, but the owner would bear the risk of loss by entrusting possession of the car to the dealership. The innocent buyer, by contrast, would not suffer the loss given his reasonable expectation that the dealership had clear title to the car and the right to sell it because the dealership regularly "deals in goods of that kind[.]" U.C.C. § 2-403(2).

The result would be different, however, if the buyer bought the car from the salesman at a vacant parking lot not knowing he was employed by the dealership. It is "well settled that § 2-403(2) protects 'only persons who buy in the ordinary course out of inventory'" from a merchant who deals in goods of that kind. *Evergreen Mar. Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 97 n.8 (1st Cir. 1993) (quoting § 2-403(2) cmt. 3).

**A. The Diamond Was Not Entrusted to Gutekunst and He Is Not a Merchant**

Mellen argues that Biltmore's claim to good title under the entrustment rule fails because Mellen never entrusted the diamond to Gutekunst, he is not a diamond merchant, and Biltmore did not buy the diamond in the ordinary course of business. Biltmore does

1    not dispute that Mellen never entrusted the diamond to Gutekunst, or that he is not a
2    diamond merchant (Biltmore was told that Gutekunst was in the vitamin supplement
3    business but he in fact sells allergy drops). (Docs. 129, 142 ¶¶ 11-13.) Rather, Biltmore
4    contends that these facts are irrelevant because Meyrowitz was the one who sold the
5    diamond to Biltmore through a purported agency relationship with Gutekunst. Biltmore
6    asserts that Meyrowitz's alleged transfer of the diamond to Biltmore through his agent
7    Gutekunst is protected by the entrustment rule. The Court disagrees.

8    　　　The plain language of the rule provides that entrusting goods "to a merchant who
9    deals in goods of that kind gives *him* the power to transfer" the goods to a buyer. U.C.C.
10   § 403(2) (emphasis added). The entrustment rule "is meant to safeguard unsuspecting
11   buyers who purchase goods *from merchants* in good faith." *Great Am. Ins. Co. v.*
12   *Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 640 (D. Md. 2014) (emphasis
13   added). The sale of goods from the merchant himself is an essential underpinning of the
14   entrustment rule. This is because the rule's purpose is to "facilitate the free flow of
15   goods based on a buyer's reasonable expectation that a merchant in possession of goods it
16   ordinarily sells has title to them." *Lakes Gas Co. v. Clark Oil Trading Co.*, 875 F. Supp.
17   2d 1289, 1305 (D. Kan. 2012). This purpose would be defeated if, as Biltmore contends,
18   the entrustment rule were to protect the purchase of a rare $2 million diamond from an
19   apparent vitamin salesman.

20   　　　The narrow definition of a "merchant that deals in goods of that kind" supports
21   this conclusion. Unlike the general definition of "merchant" in § 2-104, which includes
22   the merchant's own skill or knowledge that might not be apparent to a buyer, the concern
23   of § 2-403(2) is with a narrower class of merchants based on appearances. "An
24   individual buying a product from an apparent dealer in such goods expects to get
25   good title." *Id.* (citation omitted). Thus, one "expects to get good title when buying a
26   shiny new car from a General Motors dealer, [but] one buying goods from a mere
27   warehouseman trying to recover storage costs knows that the seller is dealing with
28   somebody else's goods." *Id.* The entrustment rule would not apply even if, unbeknownst

to the buyer, the car in fact belonged to the dealership and was sold by the warehouseman at its request.

In short, § 2-403(2) "enables a merchant to transfer rights to an entrusted good only if the person is a 'merchant' who 'deals in goods of that kind,' in this case diamonds or other high-end jewelry." *Zaretsky*, 820 F.3d at 520. Biltmore's purchase of the diamond from Gutekunst is not protected by § 2-403(2). Biltmore should have known that a four-carat fancy blue diamond worth nearly $2 million did not belong to a purported vitamin salesman. Stated differently, Biltmore had no reasonable expectation that it was buying the stone from a diamond merchant. It therefore finds no safe harbor in the entrustment rule.

Biltmore contends that reliance on the part of the buyer has no place in the entrustment rule, but the rule is specifically "designed to enhance the *reliability* of commercial sales by merchants who deal with the kind of goods sold on a regular basis[.]" *Porter*, 421 N.E.2d at 500-01 (emphasis added). For this very reason, the rule protects "*only those who purchase from the merchant to whom the property was entrusted*[.]" *Kozar v. Christie's, Inc.*, 971 N.Y.S.2d 555, 555 (N.Y. App. Div. 2013) (quoting *Porter*).

Biltmore asserted at oral argument that it would have been easy for Biltmore to believe it was buying the diamond from Meyrowitz because he was involved in the transaction, had dealings with the Gemological Institute of America (GIA), and the pawn ticket states that Gutekunst was either the owner of the diamond or authorized to act on the owner's behalf. (Doc. 127-1 at 235.) But the undisputed evidence shows that Biltmore did not *actually* believe it was buying the diamond from Meyrowitz, to whom the stone was entrusted, nor did Biltmore buy the diamond from someone it *knew* to be an agent of Meyrowitz. Goldstein testified that he believed Meyrowitz was brokering the sale of the diamond for Gutekunst, not the other way around. (Doc. 24-2 ¶ 6.) Meyrowitz told Goldstein that Gutekunst wanted to sell the diamond to get money to expand his vitamin business. (*Id.*) Goldstein made clear that the initial pawn transaction

was with Gutekunst, not Meyrowitz (*id.* ¶ 9), and Goldstein wired the $1 million loan directly to Gutekunst's bank account (Doc. 127-1 at 236-37). Goldstein further testified that he later purchased the diamond outright from Gutekunst for $1.3 million (Doc. 24-2 ¶ 10), and again the money was sent directly his way (Doc. 127-1 at 255).

This testimony is consistent with express terms of the pawn ticket. The customer listed on the ticket is "Joe Gutekunst." In pledging the diamond as security for the loan, Gutekunst indicated that he "was the owner of the pledged goods free and clear of all security interest liens." The pawn ticket was signed by Gutekunst himself, not Meyrowitz. (Doc. 127-1 at 235.) The pawn ticket, combined with Goldstein's own testimony, undisputedly shows that Biltmore believed it was buying the diamond from a vitamin salesman, not from a diamond merchant. Courts have long held "the ultimate purchaser can demonstrate reliance and invoke [the protection of § 2-403(2)] only if he believed he was buying from a dealer. The proof here is wholly lacking in [this] respect." *Atlas Auto Rental Corp. v. Weisberg*, 281 N.Y.S.2d 400, 404 (N.Y. Civ. Ct. 1967).

Biltmore contends that it does not matter that it was misled into believing Gutekunst owned the diamond because in reality Gutekunst was Meyrowitz's agent and Biltmore therefore purchased the diamond from Meyrowitz. Although it may be true that the entrustment rule protects a buyer who reasonably knows he is dealing with the lawful agent or employee of a merchant of goods (such as a salesman at a car dealership), the evidence in this case – even when construed in Biltmore's favor – does not support a finding that Biltmore knew it was purchasing the diamond from Meyrowitz through his agent.

Rather, the undisputed evidence shows that Biltmore did not know about the purported agency relationship, nor did it otherwise believe that it was buying the diamond from Meyrowitz. As explained above, the entrustment rule is meant to protect a buyer where there is a "reasonable expectation" that he is buying from a merchant who actually trades in the goods bought. *Lakes Gas Co.*, 875 F. Supp. 2d at 1305. This is what promotes the "reliability of commercial sales by [such] merchants." *Porter*, 421 N.E.2d

at 500. The fact that Biltmore did not believe, reasonably or otherwise, that Gutekunst was acting as Meyrowitz's agent, precludes a finding that Biltmore bought the diamond from a "merchant who deals in goods of that kind" under § 2-403(2).[2]

Biltmore's reliance on *Canterra* and *Standard Leasing* is misplaced. (Doc. 141 at 7-9.) In each of those cases, goods were transferred to sham corporations which reasonably appeared to be merchants in the types of goods sold in the ordinary course of business. *See Canterra Petro., Inc. v. W. Drilling & Mining Supply*, 418 N.W.2d 267 (N.D. 1987) (oil pipeline sold by owner through sham oil pipeline company); *Standard Leasing Corp. v. Mo. Rock Co.*, 693 S.W.2d 232 (Mo. Ct. App. 1985) (work trucks sold through sham leasing corporation formed by owner of construction equipment leasing company). Neither case addressed the law of agency or applied the entrustment rule where the seller did not appear to be a merchant of the goods sold.

Moreover, the court in *Canterra* distinguished a case similar to the one at hand, *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211 (Tex. Ct. App. 1984). In *Olin*, a superintendent of Cargo Carriers' fertilizer warehouse, Jerry Dollar, entered into a scheme to provide fertilizer to his co-conspirator, Charles Flowers, who pretended to be the owner of the product and sold it to an unsuspecting buyer, Pat Ragsdale. *Canterra* distinguished *Olin* as follows:

> These circumstances are materially different from the instant case. Flowers, Ragsdale's seller, was not an employee of Cargo Carriers but an outside party. Of even more significance is the court's finding that Flower's was not a merchant. Under those circumstances, the entrustment doctrine of Section 2-403, U.C.C., was inapplicable.

*Canterra*, 418 N.W.2d at 272-73. Here, like the seller in *Olin*, Gutekunst was neither a

---

[2] Citing allegations made in a related lawsuit against Gutekunst, Biltmore asserts that Mellen has judicially admitted that Gutekunst was acting as Meyrowitz's "agent." (Doc. 141 at 4.) But Mellen alleged only that Meyrowitz "orchestrated" the scheme and Gutekunst sold the diamond "on behalf of Meyrowitz." (Doc. 142 ¶ 8.) Moreover, even if this somehow served as an admission of an agency relationship, there is no evidence that Biltmore had knowledge of the relationship when it purchased the diamond.

- 11 -

diamond merchant nor an employee of Mellen or Meyrowitz.[3]

### B. Biltmore Did Not Buy the Diamond in the Ordinary Course of Business

The entrustment rule set forth in § 2-403(2) is limited to sales to a "buyer in the ordinary course of business." A sale is not in the ordinary course of business unless it is from a person "*in the business of selling goods of that kind*." U.C.C. § 1-201(9) (emphasis added). As explained above, Gutekunst is not in the business of selling diamonds.

But even if Biltmore had purchased the diamond believing Gutekunst was Meyrowitz's agent, the entrustment rule still would not apply. A buyer in the ordinary course of business "does not include a person that acquires goods . . . as security for or in total or partial satisfaction of a money debt." *Id.* Biltmore contends that it did not acquire the diamond in this manner (Doc. 141 at 13), but the record shows otherwise.

Biltmore acquired the diamond as security for the $1 million loan it extended to Gutekunst as part of the pawn transaction on March 2, 2015. The pawn ticket's security interest provision makes this abundantly clear (Doc. 127-1 at 235):

> SECURITY INTEREST: To secure my payment of this Loan and Security Agreement, I [Joe Gutekunst] hereby grant Lender [Biltmore] a security interest in the pledged goods described herein . . . . I promise to pay to the Lender, on or before the Maturity Date, the Amount Financed, plus all accrued interest and fees set forth in this Loan and Security Agreement.

When Biltmore later purchased the diamond outright for $1.3 million, it paid an additional $250,000 and forgave the $1 million loan ($50,000 was withheld as interest on the loan). (Doc. 24-2 ¶ 11.) Because a buyer in the ordinary course of business does not include someone who acquires goods "as security for or partial satisfaction of a money

---

[3] Mellen cited *Olin* for the first time at oral argument. Biltmore responded by filing a supplemental brief (Doc. 152), which Mellen has moved to strike (Doc. 153). But the Court was aware of *Olin* before oral argument. As explained above, the case was discussed at length in *Canterra*. Thus, Mellen's discussion of *Olin* at oral argument was nothing new to the Court. Nonetheless, the Court has considered Biltmore's supplemental brief addressing the case and finds that it does not change the Court's analysis. Mellen's motion to strike is denied.

- 12 -

debt," Biltmore does qualify for protection under § 2-403(2).

Biltmore claims that it actually purchased the diamond when Gutekunst pawned it on March 2, 2015, because the U.C.C. deems a "pledge" to be a purchase and pawn transactions are considered purchases under Arizona law. (Doc. 141 at 13 (citing U.C.C. § 1-201(b)(29)-(30); A.R.S. § 44-1621(9)).) But the pawn ticket undisputedly includes a provision creating a security interest in the diamond. (Doc. 127-1 at 235.) Although Gutekunst had no obligation to fully redeem the pledged diamond, he promised to make payments on the loan or risk forfeiting the diamond to Biltmore after the loan's 90-day maturity date unless the redemption period was extended, as occurred here. (*Id.*) Gutekunst made multiple $40,000 interest payments to "keep the loan/pawn open." (Doc. 127-1 at 246.) Moreover, Goldstein – an experienced diamond trader and pawnbroker – has himself testified that the pawn transaction was not converted to a purchase until he forgave the $1 million loan on November 18, 2015. (Doc. 24-2 ¶ 11.) Similarly, Biltmore affirmatively alleges in its third-party complaint that Gutekunst conspired to "initially pawn the diamond" and then later to "convert the pawn to an outright sales transaction." (Doc. 61 at 18, ¶ 70.)

Despite Biltmore's contention that it purchased the diamond on March 2, 2015, the undisputed evidence shows that the diamond was pledged as security for the $1 million loan and Biltmore later forgave the loan when it bought the diamond outright. These facts preclude a finding that Biltmore bought the diamond in the ordinary course of business under § 2-403(2).

In summary, none of the conditions of the entrustment rule can be met given that the diamond was not entrusted to Gutekunst, he is not a diamond merchant, and the diamond was not bought in the ordinary course of business. U.C.C. § 2-403(2).

**III. Biltmore Did Not Obtain Good Title to the Diamond Under U.C.C. § 9-319**

Biltmore argues that Mellen's transfer of the diamond to Meyrowitz on memo constitutes a consignment under U.C.C. § 9-102(a)(20), and Meyrowitz therefore transferred good title to Biltmore as a consignee under U.C.C. § 9-319(a). That section

provides, with certain exceptions, that a purchaser of goods "from a consignee . . . is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." The purpose of §§ 9-102(a)(20) and 9-319(a) is "to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory." *Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 402 (S.D.N.Y. 2016).

### A. The Transaction Between Mellen and Meyrowitz Was Not a Consignment

The parties agree that the terms "on memo" and "consignment" often are used interchangeably in the diamond trade, and Mellen itself has referred generally to the transaction with Meyrowitz as a "consignment." But this use of "the term alone is not 'magical.'" *In re Citation Corp.*, 349 B.R. 290, 296 (Bankr. N.D. Ala. 2006). Mellen notes, correctly, that its use of the term is no substitute for the provisions of the memo governing the transaction or the legal definition of "consignment" in § 9-102(a)(20), which requires that the goods be delivered to the merchant "for the purpose of sale[.]"

Biltmore contends that even though Meyrowitz had no authority to sell the diamond, it nonetheless was given to him "for the purpose of sale" because the end goal of the transaction was "the ultimate sale of the diamond." (Doc. 139 at 7.) But it is well settled that there is no consignment under § 9-102(a)(20) where, as in this case, a merchant "is merely entrusted with temporary possession of the [owner's] goods and has no authority to sell them." *Glenshaw Glass Co. v. Ontario Grape Grower's Mktg. Bd.*, 67 F.3d 470, 476 (3d Cir. 1995) (applying the predecessor to § 9-102(a)(20), former § 2-326(3)); *see Evergreen*, 4 F.3d at 97 n.8 ("[W]e join those courts which have held that temporary entrustments of possession by a bailee, without more, are not 'sales on consignment,' within the meaning of U.C.C. § 2-326.") (citations omitted). Similarly, where the intention of the owner "was for the identical thing to be returned in the same or some altered form, it [is] not a consignment." *In re Greenline Equip., Inc.*, 390 B.R. 576, 579 (Bankr. N.D. Miss. 2008).

As explained above, and pursuant to the express terms of the memo (Doc. 1 at 9),

Mellen delivered the diamond to Meyrowitz only for "examination and inspection" by others, not purchase. The diamond at all times was to "remain the property of [Mellen]" and had to be returned "in full in its original form." The memo makes clear that Meyrowitz acquired "no right or authority to *sell* . . . or otherwise dispose of the diamond." (*Id.* (emphasis added).) Given these provisions within the four corners of the memo – which governs the transaction between Mellen and Meyrowitz – it cannot reasonably be said that the diamond was given to Meyrowitz "for the purpose of sale." *See Glenshaw*, 67 F.3d at 476; *In re Greenline*, 390 B.R. at 579.

It is worth noting that the memo contains an integration clause, which provides that the terms of the memo "represent the entire contract with respect the [diamond] and which cannot be varied by oral statements . . . or any contrary custom of the trade." (Doc. 1 at 9.) Thus, even if the transaction has been called a "consignment" and the term is used interchangeably with "on memo" in the diamond trade, this does not convert the transaction to one for "the purpose of sale" under § 9-102(a)(20).

In summary, the transaction was not a consignment under § 9-102(a)(20), and Biltmore therefore does not have good title to the diamond under § 9-319(a), given that Meyrowitz had no authority to sell the diamond, title always remained with Mellen, and Mellen maintained the right to recall the diamond at any time. *See In re Citation*, 349 B.R. at 296-97 (finding no consignment given similar terms in the agreement despite the fact that it contained "some form of the term consign 68 times"); *see also Zaretsky*, 820 F.3d at 516 (referring to a memo as a "consignment agreement" but finding that the subsequent seller had no authority to sell or transfer title to the diamond).[4]

### B.   Biltmore Did Not Buy the Diamond from a Consignee

The plain language of § 9-319(a) limits its application to purchasers of goods

---

[4] Biltmore asserts that the Court has found that Mellen delivered the diamond to Meyrowitz for the purpose of an "anticipated sale." (Doc. 123 at 6.) The Court did note in the preliminary injunction order that Mellen delivered the diamond to Meyrowitz "to display it to potential buyers" (Doc. 54 at 8 n.7), but this is consistent with the express terms of the memo and, as explained above, does not render the transaction a consignment under § 9-102(a)(20).

- 15 -

from a "consignee," which means "a merchant to [whom] goods are delivered in a consignment." U.C.C. § 9-102(a)(19). Here, even if the transaction between Mellen and Meyrowitz constituted a consignment, Biltmore still would not have obtained good title to the diamond under § 9-319(a) because it bought the diamond from Gutekunst – not Meyrowitz, the "consignee." Because the evidence, even when construed in Biltmore's favor, shows that diamond was not delivered to Meyrowitz on consignment under § 9-102(a)(20) and Biltmore did not otherwise buy the diamond from a consignee, Biltmore did not obtain good title under § 9-319(a).[5]

## IV.  Biltmore Did Not Obtain Good Title to the Diamond Under U.C.C. § 9-317

Relying on its assertion that the transaction between Mellen and Meyrowitz was a consignment, Biltmore contends that it purchased the diamond free and clear of any security interest Mellen might have had in the diamond under § 9-317, which governs the priority of competing security interests in goods. As explained above, however, the transaction was not a consignment. Moreover, Mellen is the rightful title owner of the diamond, not one with a mere security interest in the stone.

## V.  Mellen's Claims for Declaratory Judgment, Replevin, and Conversion

In count one of its complaint, Mellen seeks a declaratory judgment under 28 U.S.C. § 2201 declaring that it is the lawful owner of the diamond. (Doc. 1 at 6, ¶¶ 18-22.) Section 2201(a) provides that in a case of actual controversy within its jurisdiction, a federal court, upon the filing of an appropriate pleading, "may declare the rights and other legal relations of any interested party seeking such a declaration[.]" In its replevin claim asserted in count two, Mellen seeks an order for the return of the diamond. (*Id.* ¶¶ 23-27.) Mellen asserts a conversion claim in count three, seeking damages should Biltmore fail to return the diamond. (*Id.* ¶¶ 28-32.)

In their summary judgment briefs, the parties address issues concerning lawful ownership of the diamond and Biltmore's affirmative defenses and claim to good title

---

[5] Given this conclusion, the Court need not reach Mellen's other arguments relating to §§ 9-102(a)(20) and 9-319(a).

under the Uniform Commercial Code. Neither side, however, addressed the specific claims asserted by Mellen in its complaint: declaratory judgment, replevin, and conversion. The Court therefore directed the parties to address these claims at oral argument. (Doc. 150.)

The parties agreed that if the ownership issue is resolved on summary judgment, the Court may grant relief on the declaratory judgment claim asserted in count one of the complaint (Doc. 1 ¶¶ 18-22) by declaring one of the parties to be the lawful owner of the diamond. *See* 28 U.S.C. § 2201. Biltmore made clear at oral argument that resolution of the declaratory judgment claim would be dispositive as to who will obtain possession of the diamond going forward and there therefore is no need to address the replevin claim once lawful ownership is decided. Mellen confirmed that it has elected the return of the diamond as a remedy and does not seek a trial and an award of damages on the replevin and conversion claims. *See* A.R.S. §§ 12-1307, -1310. Based on these agreements and concessions, and for reasons stated above, the Court grants summary judgment on the declaratory judgment claim in favor of Mellen, declares Mellen to be the lawful owner of the diamond, orders that Mellen is legally entitled to possession and return of the diamond from Biltmore, and otherwise denies summary judgment on the replevin and conversion claims asserted by Mellen.

**VI. Biltmore's Counterclaims for Slander and Tortious Interference**

"Slander of title requires proof of 'the uttering and publication of the slanderous words by the defendant, the falsity of the words, malice and special damages.'" *SWC Baseline & Crimson Investors, L.L.C. v. Augusta Ranch Ltd. P'ship*, 265 P.3d 1070, 1086 (Ariz. Ct. App. 2011) (citation omitted). Similar to the malice requirement for slander, a tortious interference claim requires "a showing that the defendant acted improperly." *Barrow v. Ariz. Bd. of Regents*, 761 P.2d 145, 152 (Ariz. Ct. App. 1988). Mellen argues that Biltmore is without evidence to support its counterclaims. The Court agrees.

Biltmore's claims for slander and tortious interference are premised on the notion that Mellen "consigned and entrusted" the diamond to Meyrowitz, and Biltmore therefore

- 17 -

1 is a "good faith purchaser for value of the diamond and [its] true owner[.]" (Doc. 61 ¶¶
2 39, 56.) But none of this is true. The undisputed evidence shows that Mellen is the
3 rightful owner of the diamond.

4 Biltmore alleges that Mellen made a slanderous statement and tortiously interfered
5 with Biltmore's ability to re-sell the diamond because Mellen contacted the GIA alleging
6 that the diamond had been stolen, thereby causing the GIA to "red flag" the diamond.
7 (*Id.* ¶¶ 54, 64.) Mellen, however, did no such thing. The evidence cited by Biltmore
8 itself shows that Mellen's attorneys contacted law enforcement who then notified the
9 GIA that the diamond had been reported stolen. (Doc. 142 ¶ 32.) Moreover, given that
10 Meyrowitz had no lawful authority to sell the diamond and it at all times remained the
11 property of Mellen, Biltmore cannot create a triable issue as to whether the statement that
12 the diamond was stolen was either false or made with malice or for an improper purpose.

13 The Court grants summary judgment in favor of Mellen on Biltmore's
14 counterclaims.

**VII. The Motions to Exclude and Strike Expert Witness Opinions and Reports**

16 Biltmore has moved to exclude the expert report of Richard Mellen (Doc. 131),
17 and has moved to strike the rebuttal report of Michael Tocicki (Doc. 137). Because the
18 Court has not relied on these reports in ruling on the motions for summary judgment, the
19 motion to exclude and motion to strike are denied as moot.

**VIII. Conclusion.**

21 There is no triable issue as to whether Mellen is the lawful owner of the diamond.
22 Biltmore has presented no evidence showing that Mellen made a slanderous statement or
23 tortiously interfered with Biltmore's business expectancy. The Court will grant summary
24 judgment accordingly.

25 **IT IS ORDERED:**

26 1. Defendant Biltmore Loan and Jewelry-Scottsdale, LLC's motion for
27 summary judgment (Doc. 123) is **DENIED**.

28 2. Plaintiff Mellen, Inc.'s motion for summary judgment (Doc. 126) is

**GRANTED IN PART** and **DENIED IN PART**.  The Court grants summary judgment in favor of Mellen on the declaratory judgement claim asserted in count one of the complaint, declares Mellen to be the lawful owner of the diamond, and orders that Mellen is legally entitled to possession and return of the diamond from Biltmore.  Mellen's motion for summary judgment is denied with respect to the claims for replevin and conversion asserted in counts two and three of the complaint.

3. Biltmore's motions to exclude and strike expert opinions and reports (Docs. 131, 137) are **DENIED** as moot.

4. Biltmore's motion to supplement briefing (Doc. 152) is **GRANTED** and Mellen's motion to strike (Doc. 153) is **DENIED**.

Dated this 24th day of March, 2017.

_____
Douglas L. Rayes
United States District Judge